**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| W. KENMORE CARDOZA, TRUSTEE OF THE W. KENMORE & JOYCE M. CARDOZA REVOCABLE TRUST DATED OCTOBER 2, 2003, Derivatively On Behalf Of CARLOTZ, INC., | Case No.: |
| Plaintiff, | |
| vs. | **JURY DEMANDED** |
| DAVID R. MITCHELL, LUIS IGNACIO SOLORZANO AIZPURU, KIMBERLY H. SHEEHY, LINDA B. ABRAHAM, MICHAEL W. BOR, STEVEN G. CARREL, SARAH M. KAUSS, JAMES E. SKINNER, AND THOMAS W. STOLTZ, | |
| Defendants, | |
| -and- | |
| CARLOTZ, INC., | |
| Nominal Defendant. | |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff W. KENMORE CARDOZA, TRUSTEE OF THE W. KENMORE & JOYCE M. CARDOZA REVOCABLE TRUST DATED OCTOBER 2, 2003 ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of Nominal Defendant CarLotz, Inc. ("CarLotz" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon his personal knowledge as to himself and their own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by CarLotz with the U.S.

Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTTION

1.     This is a shareholder derivative action brought on behalf of and for the benefit of the Company, against certain of its officers and/or directors named as defendants herein seeking to remedy Defendants (defined below) violations of Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act"), and their breaches of fiduciary duties and other wrongful conduct as alleged herein and that occurred from December 30, 2020 to the present (the "Relevant Period").  Defendants' actions have caused, and will continue to cause, substantial financial harm and other damages to the Company, including damages to its reputation and goodwill.

2.     The Company operates a consignment-to-retail used vehicle marketplace where corporate vehicle sourcing partners and retail sellers of used vehicles can sell at prices that are, on average, below those of traditional dealerships.

3.     On or about January 21, 2021, the Company became a public entity via merger with Acamar Partners Acquisition Corp. (the "Merger"), a blank check company formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization, or similar business combination with one or more businesses.

4.     On March 15, 2021, the Company announced its fourth quarter and full year 2020 financial results.  During a related conference call, the Company stated that gross profit and gross profit per unit ("GPU") "were softer than . . . expected" due to "the surge in inventory during the

quarter and the resulting lower retail unit profitability."  The Company also reported that the additional inventory "created a logjam that resulted in slower processing and higher days to sell."

5.      On this news, the Company's stock price fell $0.79, or 8.5%, to close at $8.45 per share on March 16, 2021, on unusually heavy trading volume.  The stock price continued to decline over the next two consecutive trading sessions by $0.62, or 7.3%, to close at $7.83 per share on March 18, 2021, on unusually heavy trading volume.

6.      On May 10, 2021, the Company announced its first quarter 2021 financial results revealing that gross profit per unit fell below expectations. In particular, the Company had expected retail GPU between $1,300 and $1,500 but reported $1,182.

7.      On this news, the Company's stock price fell $0.94, or 14%, to close at $5.57 per share on May 11, 2021, on unusually heavy trading volume.  The stock price continued to decline $0.45, or 8%, to close at $4.12 per share on May 12, 2021, on unusually heavy trading volume.

8.      Then, on May 26, 2021, the Company announced an update to its profit-sharing sourcing partner arrangement.  Specifically, the Company stated that its "profit sharing corporate vehicle sourcing partner informed the Company that, in light of current wholesale market conditions, it has paused consignments to the Company."  Moreover, this partner "accounted for more than 60% of the cars sold and sourced" during first quarter 2021 and "less than 50% of the cars sold and approximately 25% of cars sourced" during second quarter 2021 to date.

9.      On this news, the Company's stock price fell $0.70, or 13.4%, to close at $4.51 per share on May 26, 2021, on unusually heavy trading volume.

10.     Throughout the Relevant Period, the Company made material misrepresentations concerning the following: (i) that, due to a surge in inventory during the second half of fiscal 2020, the Company was experiencing a "logjam" resulting in slower processing and higher days to sell;

(ii) that, as a result, the Company's gross profit per unit would be negatively impacted; (ii) that, to minimize returns to the corporate vehicle sourcing partner responsible for more than 60% of the Company's inventory, the Company was offering aggressive pricing; (iv) that, as a result, the Company's gross profit per unit forecast was likely inflated; (v) that this Company's corporate vehicle sourcing partner would likely pause consignments to the Company due to market conditions, including increasing wholesale prices; and (vi) that, as a result of the foregoing, the Company's positive statements about its business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Exchange Act, 15. U.S.C. § 78j(b), and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f).

12.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

13.     Venue is proper in this Court in accordance with 28 U.S.C. § 1391 because the Company is incorporated in Delaware.

## PARTIES

**Plaintiff**

14.     Plaintiff acquired the Company securities on 1/22/2021 and will continue to hold his CarLotz shares throughout the pendency of this action.  Plaintiff will fairly and adequately

represent the interests of the shareholders in enforcing the rights of the corporation.

**Nominal Defendant**

15.     Nominal Defendant CarLotz is incorporated under the laws of Delaware with its principal executive offices located in Richmond, Virginia.

**Director Defendants**

16.     ***Defendant Michael W. Bor*** ("Bor") was, at all relevant times, the Chief Executive Officer ("CEO") and Chairman of the Board of the Company.

17.     ***Defendant David R. Mitchell*** ("Mitchell") is a director of the Company.  Defendant Mitchelle is also the Managing Director of TRP, a transportation private equity investment fund he joined in 2002.  TRP owns 19.1% of all the outstanding shares of the Company.  Defendant Mitchell owns 19.1% of all of the outstanding shares of the Company.

18.     ***Defendant Steven G. Carrel*** ("Carrel") is a director of the Company.  Defendant Carrel is the Managing Director of TRP, a transportation private equity investment fund he has been with from 1998 to 2002 and from 2004 to present.  Defendant Carrel owns 19.1% of all of the outstanding shares of the Company.

19.     ***Defendant Luis Ignacio Solorzano Aizpuru*** ("Solorzano") is a director of the Company.  Defendant Solorzano is a member of the Compensation Committee and Nominating and Corporate Governance Committee.  Further, Defendant Solorzano is the Partner and Chief Executive Officer of Acamar Partners, which owns 6.8% of the outstanding shares of the Company.  On January 21, 2021, the Company, TRP (which is controlled by Defendants Mitchell and Carrel), Acamar Sponsor (controlled by Defendant Solorzano) and Defendant Bor (CEO and Chairman of the Board of the Company) entered into a stockholders' agreement (the "Stockholders' Agreement") pursuant to which: (i) Defendant Bor will be nominated to the Board so long as he is

the Company's Chief Executive Officer or he, together with his affiliated family trusts, holds at least 10% of the outstanding shares of common stock; (ii) TRP will have the right to nominate two directors to the Board so long as it holds at least 10% of the outstanding shares of common stock; (iii) Acamar Sponsor will have the right to nominate two directors to the Board, so long as Acamar Sponsor (or its managing members, collectively) holds at least 3% of the outstanding shares of common stock; and (iv) all other directors (who will be independent) will be nominated by the Nominating and Corporate Governance Committee.  Defendant Solorzano owns 7.1% of all of the outstanding shares of the Company.

20.     *Defendant Kimberly H. Sheehy* ("Sheehy") is a director of the Company. Defendant Sheehy is the Chairman of the Audit Committee and a member of the Nominating and Corporate Governance Committee.

21.     *Defendant Linda B. Abraham* ("Abraham") is a director of the Company. Defendant Abraham is the Chair of the Compensation Committee.

22.     *Defendant Sarah M. Kauss* ("Kauss") is a director of the Company.  Defendant Kauss is a member of the Audit Committee and Compensation Committee.

23.     *Defendant James E. Skinner* ("Skinner") is a director of the Company.  Defendant Skinner is a member of the Audit Committee and the Chairman of the Nominating and Corporate Governance Committee.

24.     Defendants Bor, Mitchell, Carrel, Solorzano, Sheehy, Abraham, Kauss, and Skinner are herein referred to as "Director Defendants."

**Officer Defendant**

25.     *Defendant Thomas W. Stoltz* ("Stoltz") was the Chief Financial Officer ("CFO") of the Company at all relevant times.

6

26.     The Director Defendants and Defendant Stoltz are collectively referred to herein as "Defendants".

## THE COMPANY'S CORPORATE GOVERNANCE

27.     As members of Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

28.     The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of CarLotz, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company

## DUTIES OF THE DIRECTOR DEFENDANTS

29.     By reason of their positions as officers, directors, and/or fiduciaries of CarLotz and because of their ability to control the business and corporate affairs of CarLotz, the Director Defendants owed the Company and its shareholders the fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage CarLotz in a fair, just, honest, and equitable manner.  The Director Defendants were and are required to act in furtherance of the best interests of CarLotz and its shareholders.

30.     Each director and officer of the Company owes to CarLotz and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's operations, finances, financial condition, and present and future business

prospects so that the market price of the Company's stock would be based on truthful and accurate information.

31.     The Director Defendants, because of their positions of control and authority as directors and/or officers of CarLotz, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.   Because of their advisory, executive, managerial and directorial positions with CarLotz, each of the Defendants had access to adverse non-public information about the financial condition, operations, sales and marketing practices, and improper representations of CarLotz.

32.     To discharge their duties, the officers and directors of CarLotz were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.   By virtue of such duties, the officers and directors of CarLotz were required to, among other things:

(a)     Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)     Conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     Properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and

accurate at all times;

 (d) Remain informed as to how CarLotz conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

 (e) Ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

 (f) Ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

 33. Each Director Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of CarLotz, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware or should have been aware posed a risk of serious injury to the Company.

 34. The Director Defendants breached their duties of loyalty and good faith by causing the Company to misrepresent the information as detailed *infra*. The Director Defendants' subjected the Company to the costs of defending, and the potential liability from, the securities class action. As a result, CarLotz has expended, and will continue to expend, significant sums of

money.

35.     The Director Defendants' actions have irreparably damaged CarLotz's corporate image and goodwill.

## AUDIT COMMITTEE

36.     The purpose of the Audit Committee is to prepare the Audit Committee Report required by the SEC to be included in the Company's Proxy Statement and to assist the Board in overseeing and monitoring: (i) the quality and integrity of the Company's financial statements; (ii) the Company's compliance with legal and regulatory requirements; (iii) the Company's independent registered public accounting firm's qualifications and independence; (iv) the performance of the Company's internal audit function; and (v) the performance of the Company's independent registered public accounting firm.

## THE FALSE AND MISLEADING STATEMENTS

**Background**

37.     The Company operates a consignment-to-retail used vehicle marketplace where corporate vehicle sourcing partners and retail sellers of used vehicles can sell at prices that are, on average, below those of traditional dealerships.

## FALSE AND MISLEADING STATEMENTS

38.     On December 30, 2020, the Company filed its Prospectus on Form 424B3. Regarding inventory build-up, the Company stated:

> In March 2020, the World Health Organization declared the outbreak and spread of the COVID-19 virus a pandemic. COVID-19 impacted both sales and inventory count from March through September 2020. Unit volumes hit a trough in April 2020, with 40% year-over-year declines. We implemented proactive cost-structure optimization measures that helped ensure we maintained sufficient liquidity and we implemented a number of measures to protect the health and safety of our customers and our workforce. Our May 2020 sales grew over 40% month-over-month as travel restrictions began to ease. As wholesale prices skyrocketed, we used our asset-light,

non-competitive vehicle sourcing model to defend and grow our margins. With our maintained focus, we delivered our most profitable months since our inception and we believe we are poised to return to industry-leading growth. ***Our retail vehicle units sold were 583 in October and 624 in November, with our starting inventory increasing to 2,172 vehicles as of November 1, 2020 and 2,273 as of December 1, 2020 as compared to 1,567 vehicles available for sale as of September 30, 2020, as we accelerated intake from a rapidly growing national OEM account.*** [Emphasis added].

39.     Moreover, the Prospectus stated that "[i]f we are unable to operate our processing centers efficiently, we ***could*** experience delivery delays, a decrease in the quality of our reconditioning services, ***delays in listing our inventory, additional expenses and loss of potential and existing corporate vehicle sourcing partners*** and retail sellers and subsequent revenues, which ***may*** materially and adversely affect our business, financial condition and results of operations."

40.     The Prospectus stated that "[f]or the nine months ended September 30, 2020, three of our corporate vehicle sourcing partners, with whom we do not have long term consignment contracts, accounted for 49% of the cars we sold."  The Company further stated that "[f]or the six months in the period ended November 30, 2020, two of our corporate vehicle sourcing partners, with whom we do not have long-term consignment contracts, accounted for more than 50% of the cars we sold and more than 50% of our revenues during this period was derived from the sale of these cars."

41.     As to gross profit, the Company stated in the Prospectus that retail gross profit per unit increased "to $1,900 per unit for the nine months ended September 30, 2020 . . . driven by a shift in the sale of owned units to consigned units."  However, the Company stated that its gross profit per vehicle could "fluctuate from period to period" due to the Company's "alternative fee arrangements with corporate sourcing partners."  Specifically, the Company stated in the Prospectus:

In addition to our flat fee pricing model, we enter into alternative fee arrangements with certain of our corporate vehicle sourcing partners, which can include arrangements where we share a percentage of vehicle sale proceeds and/or customer fees with our corporate sourcing partners. ***Under these sharing arrangements, our gross profit for a particular unit could be higher or lower than the gross profit per unit we would realize under our flat fee pricing model depending on the unit's sale price and fees we are able to charge in connection with the sale***. As we do not have binding long term contracts with our corporate vehicle sourcing partners and do not require them to make vehicles available to us, our mix of vehicles sourced under alternative fee arrangements is likely to fluctuate over time. Our gross profit per unit is therefore likely to fluctuate from period to period, perhaps significantly, due to our sourcing partner mix as well as due to the sales prices and fees we are able to collect on the vehicles we source under alternative fee arrangements.  [Emphasis added].

42.     The statements in paragraphs ¶¶ 38-41 above were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Company made material misrepresentations concerning the following: (1) that, due to a surge in inventory during the second half of fiscal 2020, the Company was experiencing a "logjam" resulting in slower processing and higher days to sell; (2) that, as a result, the Company's gross profit per unit would be negatively impacted; and (3) that, as a result of the foregoing, the Company's positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

**FURTHER STATEMENTS**

43.     On March 15, 2021, the Company stated that its profits were impacted by the surge in inventory during the fourth quarter. Specifically, the Company held a conference call[1] in connection with the release of its fourth quarter and full year 2020 financial results. During the call, Defendant Stoltz stated that profits were impacted by "the surge in inventory during the quarter and the resulting lower retail unit profitability, as a result of slower sell-throughs and more vehicles wholesaled." Similarly, Defendant Bor stated that "[t]he additional inventory that we

---

[1]     https://edge.media-server.com/mmc/p/57fx2g4o.

secured to drive our growth put pressure on our processing centers and created a logjam that resulted in slower processing and higher days to sell," and Defendant Stoltz stated that as a result, gross profit and GPU "increased 25%, but were softer than we expected."

44.     On this news, the Company's stock price fell $0.79, or 8.5%, to close at $8.45 per share on March 16, 2021, on unusually heavy trading volume.  The stock price continued to decline over the next two consecutive trading sessions by $0.62, or 7.3%, to close at $7.83 per share on March 18, 2021, on unusually heavy trading volume.

45.     However, during the same conference call[2], Defendant Bor assured that the Company "[is] remediating [these issues] through increased staffing, enhanced leadership, and process improvements." Defendant Stoltz also stated that "[a]s we work through this excess inventory, a large majority of what we're selling right now is this profit share program and as we get our inventory levels more in line with where they should be based on the demand in our existing hubs, we will see the GPU improve substantially on that front." Similarly, during the conference call[3], Defendant Stoltz went on to assure that the Company "expect[s] our flow of inventory to better match demand now through the balance of this year."  Defendant Stoltz further stated:

> In the meantime, we expect the higher than ideal inventory levels that we saw earlier this year in our existing hubs to impact our first quarter 2021 gross profit and second quarter to a lesser extent, which impacts our full-year gross profit and GPU guidance.

46.     The same day, the Company filed its annual report on Form 10-K with the SEC for the period ended December 31, 2020 (the "2020 10-K"). Regarding sourcing partners, the 2020 10-K stated:

> ***One or more of our corporate vehicle sourcing partners may represent 10% or more of our total vehicles consigned, and at times significantly more, in the normal course of our vehicle sourcing***.

---

[2]     *Id.*
[3]     *Id.*

One or more of our corporate vehicle sourcing partners will often represent 10% or more of the vehicles we source over a particular period. For example, during the year ended December 31, 2020, two of our corporate vehicle sourcing partners, with whom we do not have long-term consignment contracts, accounted for over 40% of the cars we sold. ***Furthermore, for the fourth quarter of 2020 and continuing during the first quarter of 2021 to date, one of our corporate vehicle sourcing partners has accounted for over 60% of our vehicles sourced. Over time, we may have concentrations of 10% or more for a number of reasons, and the concentrations will often vary among corporate vehicle sourcing partners.*** Some corporate vehicle sourcing partners may make a supply of vehicles available at certain times of a given year, while others may increase or decrease their flow of vehicles for a number of reasons, including the performance of their business or prevailing business considerations and economic conditions.

Furthermore, at times, we may source a significantly higher portion of our consigned vehicles from one or more corporate vehicle sourcing partners. Such concentrations can result from a variety of factors, some of which are beyond our control. During any given time period, we may elect to source a higher percentage of vehicles from one or more corporate vehicle sourcing partners for a variety of reasons, including the availability of specific vehicle makes and models.

***Sourcing a significant portion of our consigned vehicles from a limited number of corporate vehicle sourcing partners exposes us to a number of risks. Our agreements with our corporate vehicle sourcing partners are generally subject to cancellation by either party upon 30 to 90 days' notice***. Generally, corporate vehicle sourcing partners make non-binding long-term commitments to us regarding consignment volumes. ***If a corporate vehicle sourcing partner from which we are sourcing a significant portion of our vehicles were to cease or significantly reduce making vehicles available to us, it could adversely affect our business, financial condition and results of operations as we would likely need to increase our sourcing of vehicles from other vehicle sourcing partners potentially on less favorable terms and conditions.*** Such an effort may take a number of months and may not precisely replicate the variety and quality of vehicles we have been sourcing from this single source. Further, we could be required to increase our purchasing of vehicles to maintain optimal inventory levels and mix as we work to increase vehicle supply from other vehicle sourcing partners, which could negatively affect our margins and gross profit per vehicle. Furthermore, having a high concentration of vehicles in our inventory on consignment from a single corporate vehicle sourcing partner could indirectly expose us to credit risk with respect to that corporate vehicle sourcing partner as we may be restricted from selling those vehicles or realizing profits on the sale of those vehicles in the event of that corporate vehicle sourcing partner's insolvency.  [Emphasis in original].

47.     Furthermore, the 2020 10-K stated that GPU could decline due to the nature of fee

arrangements with the Company's corporate vehicle sourcing partners.  Specifically, it stated:

> For the fourth quarter of 2020 and continuing during the first quarter of 2021 to date, one of our corporate vehicle sourcing partners with whom we have an alternative fee arrangement has accounted for over 60% of our vehicles sourced.

> Under our fee arrangement with this corporate vehicle sourcing partner, vehicles are returned to the corporate vehicle sourcing partner from consignment if the vehicle has not been sold through our retail channel within a specified time period.

> In such instances, we are responsible for the expenses we have incurred with respect to the vehicle, including shipping costs and any refurbishment costs we have incurred. ***We have returned a number of vehicles from consignment during the first quarter of 2021 to date and expect to continue to return vehicles into the second quarter of 2021 as we seek to better match our intake of vehicles under this arrangement to our sales and reconditioning capacity. The expenses associated with these returned vehicles will reduce our gross profit during the first quarter of 2021 and for subsequent periods during which we experience such vehicle returns***.  [Emphasis added].

48.     The above statements identified in ¶¶ 43-47 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Company made material misrepresentations concerning the following: (1) that, to minimize returns to the corporate vehicle sourcing partner responsible for more than 60% of the Company's inventory, the Company was offering aggressive pricing; (2) that, as a result, the Company's gross profit per unit forecast was likely inflated; (3) that this corporate vehicle sourcing partners would likely pause consignments to the Company due to market conditions, including increasing wholesale prices; and (4) that, as a result of the foregoing, the Company's positive statements about its business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

49.     On May 10, 2021, the Company announced its first quarter 2021 financial results revealing that gross profit per unit fell below expectations.  In a press release[4], the Company stated:

---

[4]      https://investors.CarLotz.com/news-releases/news-release-details/CarLotz-announces-record-revenue-and-retail-unitsales-first.

15

|  | Guidance | Results |  |
|---|---|---|---|
| New Hub Openings | Three | Three | Met Expectations |
| Retail Units Sold | 1,900 to 2,100 | 2,554 | Exceeded Expectations |
| Net Revenue | $42 to $46 million | $56.6 million | Exceeded Expectations |
| Gross Profit | $1.6 to $2.0 million | $2.0 million | Met Expectations |
| Retail Gross Profit per Unit ("Retail GPU") | $1,300 to $1,500 | $1,182 | Below Expectations |
| SG&A Expenses | $17 to $19 million | $18.9 million, excluding non-cash stock compensation expense of $42 million | Met Expectations |
| Net Loss | $(16) to $(15) million | $(15) million | Met Expectations |

50.     The same day, the Company held a conference call[5] to discuss the results.  During the call, Defendant Stoltz stated "gross profit and retail GPU both decreased year-over-year as a result of the carryover of Q4 excess inventory as related to our profit share account."  Defendant Stoltz assured that the Company had "cleared substantially all of this aged inventory in the quarter ahead of schedule with aggressive pricing rather than absorbing shipping and reconditioning costs on vehicles returns to the client. While this negatively impacted our retail GPU in the quarter, we did achieve the high end of our gross profit guidance by selling more of these units late in the quarter."  Though the Company claimed that its retail GPU would "improve," Defendant Bor stated that the Company decided "not to give specific guidance," raising doubts about the Company's visibility into gross profit for the remainder of the fiscal year.

51.     On this news, the Company's stock price fell $0.94, or 14%, to close at $5.57 per share on May 11, 2021, on unusually heavy trading volume.  The stock price continued to decline $0.45, or 8%, to close at $4.12 per share on May 12, 2021, on unusually heavy trading volume.

52.     The above statements identified in ¶¶ 49-50 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and

---

[5]     https://edge.media-server.com/mmc/p/vgkppqua.

prospects. Specifically, the Company made material misrepresentations concerning the following: (1) that one of the Company's corporate vehicle sourcing partners, responsible for more than 60 of the Company's inventory, would pause consignments to the Company due to market conditions, including increasing wholesale prices; and (2) that, as a result of the foregoing, the Company's positive statements about its business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

## ADDITIONAL DISCLOSURES

53.     On May 26, 2021, the Company announced an update to its profit-sharing sourcing partner arrangement. Specifically, the Company stated that its "profit-sharing corporate vehicle sourcing partner informed the Company that, in light of current wholesale market conditions, it has paused consignments to the Company."  Moreover, this partner "accounted for  more than 60% of the cars sold and sourced" during first quarter 2021 and "less than 50% of the cars sold and approximately 25% of cars sourced" during second quarter 2021 to date. As a result, the Company lowered its fiscal 2021 outlook:

**Updated 2021 Outlook**

The Company is updating its 2021 outlook and financial guidance and comments with respect to its expected second quarter 2021 performance previously provided on May 10, 2021 as a result of:

•     the current business climate, as impacted by the lack of vehicles from this profit-sharing account, coupled with the unpredictable timeline of the chip shortage for new cars and its impact on the wholesale and retail automotive markets; and

•     the slippage in certain hub openings to later than previously expected.

For the full year 2021, the Company expects the following results. This 2021 outlook assumes that, in the second quarter of 2021, the Company will sell greater than 2,000 retail units and will achieve a gross profit per unit of at least $1,800.

| New Hub Openings | 14 to 16 hub openings, most of which are expected to open in the back half of the year |
|---|---|
| Retail Units Sold | 13,000 to 15,000, which represents more than a 100% increase over 2020 retail units sold |
| Net Revenue | $272 to $317 million, which represents more than a 125% increase over 2020 net revenue |
| Gross Profit | $20 to $26 million, which represents more than a 75% increase over 2020 gross profit |
| Retail GPU | $1,650 to $1,850 |
| SG&A Expenses | $98 to $102 million, excluding non-cash stock compensation expense expected to be approximately $52 million |
| Adjusted EBITDA* | $(82) to $(72) million |
| Weighted Average Common Stock Shares Outstanding | 111 million shares |
| Capital Expenditures | $45 to $50 million |

146.   On this news, the Company's stock price fell $0.70, or 13.4%, to close at $4.51 per share on May 26, 2021, on unusually heavy trading volume.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

147.   Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of Defendants' violations of Sections 10(b) and 21D of the Exchange Act, and their breaches of fiduciary duties and other wrongful conduct as alleged herein and that occurred during the Relevant Period.

148.   Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

149.   Plaintiff is a current owner of the Company stock and has been an owner of Company stock during the Relevant Period.  Plaintiff understands his obligation to hold stock throughout the duration of this action and are prepared to do so.

150.    Because of the facts set forth herein, Plaintiff has not made a demand on the Board of the Company to institute this action against the Director Defendants.  Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

151.    At the time this suit was filed, the Board was comprised of eight (8) members -- Bor, Mitchell, Carrel, Solorzano, Sheehy, Abraham, Kauss, and Skinner.   Thus, Plaintiff is required to show that a majority of Defendants, *i.e.*, four (4), could not exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

152.    The Director Defendants face a substantial likelihood of liability in this action because they caused the Company to issue false and misleading statements concerning the information described herein.  Because of their advisory, executive, managerial, and directorial positions with the Company, the Director Defendants had knowledge of material non-public information regarding the Company and were directly involved in the operations of the Company at the highest levels.

153.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

154.    The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this Complaint, Plaintiff did not make (and was excused from making) a pre-filing demand on the Board to initiate this action because making a demand would have been a futile and useless act.

155.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

156.    Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

157.    Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

## THE DIRECTOR DEFENDANTS WERE NOT INDEPENDENT

### Defendant Bor

158.    Defendant Bor is the Company's CEO.  Defendant Bor is also the Chairman of the Board of the Company.  Defendant Bor is not disinterested or independent, and therefore, is incapable of considering demand because Defendant Bor (as CEO) is an employee of the Company who derives substantially all of his income from his employment with the Company, making him not independent.  As such, Defendant Bor could not independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would have exposed him to liability and threaten his livelihood.

159. This lack of independence and financial benefits received by Defendant Bor renders him incapable of impartially considering a demand to commence and vigorously prosecute this action.

160. Further, Defendant Bor is also a defendant in the securities class action entitled *Turk v. CarLotz, Inc., et al.*, Case 1:21-cv-06627 (S.D.N.Y.) ("Securities Class Action").

**Defendants Mitchell and Carrel -- Managing Directors of TRP**

161. Prior to the closing of the Merger, pre-Merger the Company incurred monthly management fees of $21,000 payable to TRP, of which $373,000 has been paid or accrued for the year ended December 31, 2020. The management fee expenses are reflected as Management Fee Expense — Related Party on the audited consolidated financial statements of pre-Merger CarLotz.

162. Pre-Merger CarLotz had a payable to TRP, totaling $5.1 million as of December 31, 2020, and has included this balance in accrued expenses on its consolidated balance sheet included in Pre-Merger CarLotz' consolidated financial statements.

163. Endurance Dealer Services LLC, which is owned by TRP, underwrites and administers contracts sold by CarLotz and ultimately reinsured by Orange Peel Protection Reinsurance, Ltd., a wholly-owned subsidiary of CarLotz.

164. In 2019, as part of its normal course of business, CarLotz entered into a Master Services Agreement with Flex Fleet Rental LLC, as one of the corporate vehicle sourcing partners that CarLotz services. TRP is an investor in Flex Fleet Rental LLC.

165. Defendant Mitchell and Carrel are managing directors of TRP.

166. Defendants Mitchell and Carrel's company (TRP) has done substantial business with CarLotz, and the prospect of doing more casts significant doubt on their disinterestedness.

**Registration Rights and Lock-Up Agreement –**
**<u>Defendants Solorzano, Mitchell, Carrel and Bor</u>**

167.    On January 21, 2021, the Company entered into a registration rights and lock-up

agreement (the "Registration Rights and Lock-Up Agreement") with Acamar Sponsor (controlled

by Defendant Solorzano) and certain pre-Merger CarLotz stockholders (the "New Holders" and,

collectively with Acamar Sponsor, the "Holders") that required the Company to, among other

things, file and have declared and maintained effective a registration statement to register the resale

of certain shares of common stock held by the Holders, which registration statement was declared

effective on March 23, 2021.

168.    In addition, pursuant to the terms of the Registration Rights and Lock-Up

Agreement and subject to certain requirements and customary conditions, TRP (controlled by

Defendants Mitchell and Carrel), Defendant Bor and Acamar Sponsor (controlled by Defendant

Solorzano) (the "Demanding Holders") each have two demand rights under which they may

demand, at any time and from time to time, that the Company file a registration statement on Form

S-3 (or Form S-1 if Form S-3 is not available) to register the securities of the Company held by

such Demanding Holder, and each may specify that such demand registration take the form of an

underwritten offering.  The Demanding Holders have unlimited rights to request that the Company

register an underwritten offering pursuant to the resale registration statement.  Holders also have

"piggy-back" registration rights, subject to certain requirements and customary conditions.  The

Registration Rights and Lock-Up Agreement also provides that the Company will pay certain

expenses relating to such registrations and indemnify the Holders against (or make contributions

in respect of) certain liabilities that may arise under the Securities Act.

169.    The Registration Rights and Lock-Up Agreement further provides for the securities

of the Company held by certain of the New Holders to, subject to certain exceptions, be locked-up

until the earliest of: (i) July 20, 2021; (ii) the last consecutive trading day where the last reported sale price of the common stock equals or exceeds $12.00 per share for any 20 trading days within a 30-trading day period commencing not earlier than June 20, 2021; or (iii) such date on which the Company completes a liquidation, merger, stock exchange, reorganization or other similar transaction that results in all stockholders having the right to exchange their shares of common stock for cash, securities or other property.

170.    Defendants Solorzano, Mitchell, Carrel and Bor's business is so intertwined the prospect of them suing each other casts doubt on their disinterestedness.

**Subscription Agreements –**
**Defendants Solorzano, Mitchell, Carrel and Bor**

171.    In connection with the execution of the Merger Agreement, effective as of October 21, 2020, Acamar Partners (controlled by Defendant Solorzano) entered into separate subscription agreements (each, a "Subscription Agreement") with a number of purchasers of the PIPE Shares (the "Subscribers"), pursuant to which the Subscribers agreed to purchase, and Acamar Partners agreed to sell to the Subscribers, shares of common stock (the "PIPE Shares"), for a purchase price of $10.00 per share and an aggregate purchase price of $125.0 million (the "PIPE Investment"). Pursuant to the terms of the Subscription Agreements and subject to certain requirements and customary conditions, the Company is required to file and maintain an effective registration statement with respect to the PIPE Shares for the benefit of the Subscribers.

172.    As part of the PIPE Investment, TRP (controlled by Mitchell and Carrel) purchased 1,000,000 PIPE Shares for $10,000,000, Defendant Bor purchased 166,000 PIPE Shares for $1,660,000, Acamar Sponsor (controlled by Defendant Solorzano) purchased 250,214 PIPE Shares for $2,502,140 and KAR purchased 500,000 PIPE Shares for $5,000,000.

173.    Defendants Solorzano, Mitchell, Carrel and Bor's business is so intertwined the prospect of them suing each other casts doubt on their disinterestedness.

**Defendants Kauss, Sheehy and Skinner**

174.    Defendants Kauss, Sheehy and Skinner served as members of the Audit Committee at all relevant times. As such, they are responsible for the effectiveness of the Company's internal controls, the integrity of its financial statements, and its compliance with laws and regulations.  As alleged herein, Kauss, Sheehy and Skinner failed to ensure the integrity of the Company's internal controls, allowing the materially misleading financial statements to be disseminated in the Company's SEC filings and other disclosures. Thus, Kauss, Sheehy and Skinner breached their fiduciary duties and are not interested, and demand is excused as to them.

**COUNT I**

**(Against Defendants Bor and Stoltz for Violations of
Sections 10(b) and 21D Of The Exchange Act)**

175.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

176.    The Company, along with Defendants Bor and Stoltz are named as defendants in the Securities Class Action, which assert claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder.  If and when the Company is found liable in the Securities Class Action for these violations of law, the Company's liability will be in whole or in part due to Defendants Bor and Stoltz's willful and/or reckless violations of their obligations as officers and directors of the Company.

177.    Through their positions of control and authority as officers of the Company, Defendants Bor and Stoltz were able to and did, directly and/or indirectly, exercise control over

the business and corporate affairs of the Company, including the wrongful acts described in the Securities Class Actions and herein.

## COUNT III

### (Against the Director Defendants for Breach of Fiduciary Duty)

178.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

179.   The Director Defendants owed the Company fiduciary obligations.  By reason of their fiduciary relationships, the Director Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

180.   The Director Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

181.   The Director Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  Among other things, the Director Defendants breached their fiduciary duties of loyalty and good faith by allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

182.   As a direct and proximate result of the Director Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

183.   As a direct and proximate result of the Director Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate

image and goodwill.  Such damage includes, among other things, costs associated with defending and/or settling securities lawsuits and governmental investigations, severe damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

## COUNT IV

### (Against the Director Defendants for Waste of Corporate Assets)

184.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

185.   The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period.  It resulted in continuous, connected, and ongoing harm to the Company.

186.   As a result of the misconduct described above, the Director Defendants wasted corporate assets by, *inter alia*: (a) paying excessive compensation, bonuses, and termination payments to certain of its executive officers; (b) awarding self-interested stock options to certain officers and directors; and (c) incurring potentially millions of dollars of legal liability and/or legal costs to defend and/or settle actions addressing Defendants' unlawful actions.

187.   As a result of the waste of corporate assets, the Director Defendants are liable to the Company.

188.   Plaintiff, on behalf of the Company, has no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(A)   Declaring that Plaintiff may maintain this action on behalf of the Company and that Plaintiff is an adequate representative of the Company;

(B)     Finding Defendants liable for breaching their fiduciary duties owed to the Company;

(C)     Directing Defendants to take all necessary actions to reform and improve the Company's corporate governance, risk management, and internal operating procedures to comply with applicable laws and to protect the Company and its stockholders from a repeat of the rampant wrongful conduct described herein;

(D)     Awarding damages to the Company for the harm the Company suffered as a result of the Defendants' wrongful conduct;

(E)     Awarding damages to the Company for Defendants Bor and Stoltz's violations of Sections 10(b) and 21D of the Exchange Act;

(F)     Awarding Plaintiff the costs and disbursements of this action, including attorneys', accountants', and experts' fees; and

(G)     Awarding such other and further relief as is just and equitable.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: September 21, 2021

**BIELLI & KLAUDER, LLC**

*/s/ Ryan M. Ernst*
Ryan M. Ernst, Esq. (No. 4788)
1204 N. King Street
Wilmington, DE 19801
Telephone: (302) 803-4600
Facsimile: (302) 397-2557
Email: rernst@bk-legal.com

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna
Gregory M. Egleston

501 Fifth Avenue, 19th Floor
New York, NY 10017
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: egleston@gme-law.com

*Attorneys for Plaintiff*